FIRST NATIONAL BANK OF MT. PLEASANT, Appellant, v. A. V. HOLLEY et al., Appellees.

**BILLS AND NOTES:** Accommodation Paper—Liability—Evidence. The
1   maker of an accommodation note is not liable thereon to the party accommodated. Evidence held to show that the plaintiff was the accommodated party, and not the bank of which the makers were directors. (See Book of Anno., Vol. 1, Sec. 9489.)

**EVIDENCE:** Parol As Affecting Writings—Parol on Issue of "Ac-
2   commodation." Parol evidence to the effect that the payee of a note assured the maker, when the note was executed, that the maker would *never be compelled to pay it* is admissible on the issue whether the note was an accommodation note for the accommodation of plaintiff. (See Book of Anno., Vol. 1, Sec. 9461, Anno. 17; Sec. 9476, Anno. 13 *et seq.*)

Headnote 1: 8 C. J. pp. 259, 1053 (Anno.) Headnote 2: 22 C. J. p. 1229.

*Appeal from Henry District Court.*—OSCAR HALE, Judge.

NOVEMBER 17, 1925.

THIS is a suit in equity, brought upon a promissory note and to foreclose collateral given as security therefor. The note was for $15,000, upon which a credit of $4,500 had been entered. The defense was: (1) That the note was given without consideration, and as an accommodation note only; (2) that it was ob-

tained by deception and false representations. A trial being had on the merits, the district court dismissed the petition, and the plaintiff appeals.—*Affirmed.*

*La Monte Cowles,* for appellant.

*J. R. Frailey* and *J. V. Gray,* for appellees.

Evans, J.—The plaintiff brings this action as "Liquidating Agent" for the National State Bank of Mt. Pleasant. The defendants are former directors of the Rome Savings Bank. For the purpose of the discussion, it will be more convenient for us to refer to the National State Bank of Mt. Pleasant as the plaintiff in the case. No question is raised as to the authority of the First National Bank to maintain the action as "Liquidating Agent," nor is any question made that the National State Bank is the party in interest. Out of an abundance of caution, counsel for the respective parties have discussed in their briefs many questions of law. Upon the record before us, we observe little difficulty with any legal question presented, and we are mainly concerned over questions of fact. The record is voluminous and complicated, and in some respects quite unsatisfactory. It will be impracticable for us to go into the details of the evidence. We shall state, however, as briefly as we may, the dominant reasons for the conclusion which we reach.

1. Bills and notes: accommodation paper: liability: evidence.

The plaintiff-bank (the National State) was located at Mt. Pleasant. The Rome Savings Bank was located at Rome, a near-by town. Both banks had been in operation for many years, and were so operated substantially under the same management. Whiting, the president of the plaintiff-bank, was also president of the Rome Savings Bank, up to a few weeks prior to the origin of the cause now in suit. Gillis, the vice president of the plaintiff-bank, was a director in the Rome Savings Bank. Whiting also represented other Mt. Pleasant stockholders, either as agent or otherwise, and held control of the majority of the stock. Shortly prior to October 28, 1920, Whiting and Gillis sold their stock, and one Johnson (not a witness in the case) became president on October 28, 1920, and this presidency lasted about one month. The Rome Savings Bank was heavily indebted

to the plaintiff-bank, and Whiting and Gillis continued to interest themselves actively in its affairs, after their official connection had ceased, and were frequently in consultation with its officers. Shortly prior to December 11, 1920, the defendant Holley was solicited, as he claims, by Whiting and Gillis and some others to become president of the Rome bank. Holley was a farmer, without any experience as a banker, and was not a stockholder. On December 11th he was elected president, and on December 17th he qualified by purchasing one share of stock. On the same date, defendants Messer and Scott were elected directors, and they qualified by each purchasing one share of stock. Each of them was a farmer, without any experience as a banker. The other two directors were the defendants Fitch and Peterson, who had been directors for three or four years. They also were farmers, and manifestly had very little knowledge of banking methods.

The note in suit was one of a series of three, the last two of which were successive renewals of the first note, for a like amount. The defense to the note in suit begins with the original note, which was executed on December 6, 1920. That note was signed by the defendants Peterson and Fitch and by one O'Laughlin, who was then a director. The first renewal was signed by these five defendants on February 24, 1921. The Rome bank went into the hands of a receiver on March 23, 1921. Its largest creditor was the plaintiff-bank. We cannot avoid the conclusion, upon this record, that the Rome bank was insolvent when Whiting and Gillis retired therefrom, and that no one else knew its condition as well as they did. Nothing out of the ordinary is shown to have happened to its assets between October 28, 1920, and March 23, 1921. Nor can we avoid the conclusion that these defendants were ignorant of its insolvent condition, up to a few days before its doors were closed. And this is more especially so as to the three defendants who were elected as directors on December 11th.

The first contention of the defendants is that the original note and its renewal were given as accommodation paper for the use of the plaintiff-bank. It is undisputed that the notes were accommodation notes. The contention of the plaintiff-bank is that the accommodated party was the Rome bank, and not itself.

The testimony for the defendants is that they were asked by Whiting and Gillis to furnish this note because the plaintiff-bank had extended so much credit to the Rome bank that it was under the necessity of borrowing for itself from one of the Chicago banks, and they wanted to use an accommodation note for that purpose. Such was the appeal, according to the defendants, which won their assent to the execution of each note. The original note was drawn, not to the Rome bank as payee, but to the plaintiff-bank; and this was true as to each note. The note in each case was drawn by Gillis. The fact that the note was so drawn lends some corroboration to the testimony of the defendants. It appears also that, on December 6, 1920, the plaintiff-bank held the obligations of the Rome bank for a total of more than $33,000. It held, as collateral security for such obligations, United States liberty bonds in excess of $32,000, and other discounts of the Rome bank, giving it a large margin of security. The accommodation note was not then used in the reduction of any such existing obligations nor in the release of any collateral. It did not in fact appear upon the books of the plaintiff-bank until a date about three weeks later. This circumstance lends some corroboration to the defendants. When the renewal note of February 24, 1921, was signed by the five defendants herein, Gillis was present, and gave the same assurances as before as to the character of the paper as an accommodation note. He naturally contends that he only meant by this to refer to the Rome bank as the accommodated party. On this occasion he suggested that the Rome Savings Bank issue its certificate of deposit, to be attached as collateral. This he explains by saying that it was intended as security to the signers of the note. He so explained it at that time. What was done was that a blank certificate of deposit, signed by the cashier, was presented to these defendants for the indorsement of their signatures on the back thereof. They so indorsed it. This blank certificate of deposit was taken by Gillis and afterwards filled out by him. As filled out, it purported to receipt for a deposit of $15,000 from the defendants herein, but it was drawn payable to the plaintiff-bank. Why it was drawn in this peculiar form, neither Gillis nor any other witness was able to explain.

The defendants testified, respectively, that, at the time of

the signing, they were emphatically assured by Gillis that the note was an accommodation note, and that they would never have to pay it. This evidence is assailed in appellant's brief as being contradictory to the written promise contained in the note, and therefore inadmissible. It is clearly true that such evidence cannot ordinarily be received to contradict the written promise contained in the note. If this were not an accommodation note, but were one executed for a consideration, such evidence would be inadmissible. It does not follow that such evidence may not be received as a circumstance bearing on the question as to who was the accommodated party. This assurance was given by Gillis, as representative of the payee, the plaintiffbank. He was presumptively speaking for his own bank, and not for the Rome Savings Bank. It was consistent with the character of the note as accommodation paper that he should give such assurance on behalf of the payee. If the payee was a holder of the note, not as accommodation paper, but as paper given for a consideration, then the assurance was misleading, and was inconsistent with the later attitude of the plaintiffbank. If he gave such assurance on behalf of the Rome Savings Bank as the accommodated party, then he did so knowing better than anyone else, save Whiting, that the Rome bank was insolvent, and that his assurance was false. We think that the defendants could properly accept his assurance as relating to the good faith of himself and of his own bank. Whiting and Gillis were examined as witnesses. Their personal testimony is very unsatisfactory, and their disclosure of their own records as to the mutual transactions between the two banks is very incomplete. We reach the conclusion, it being conceded that the note was an accommodation note, that the plaintiff-bank must be deemed the accommodated party, and that the trial court properly dismissed the petition.

We are somewhat influenced and confirmed in this conclusion because it is more consistent with honesty and fair dealing on the part of Whiting and Gillis toward the defendants. If it were necessary to reach the contrary conclusion, it would weld the last link in a chain of circumstances tending strongly to show that these defendants had been deceived and defrauded

*2. EVIDENCE: parol as affecting writings: parol on issue of "accommodation."*

by these officers of the plaintiff-bank. The field of circumstances in this case is much broader than the mere events attending the signing of the notes in suit by the defendants on the date thereof. The initial circumstance which carries a large question mark was the sale of the majority stock by Whiting and Gillis. This was done secretly, and without the knowledge of their former associates upon the board of directors. At this very time the plaintiff-bank was the creditor of the Rome Savings Bank to an amount largely in excess of the total capital of the Rome bank. This relation had been created under the management of Whiting and Gillis. Why they should part with their controlling interest at such a juncture is a question which naturally arises in the judicial mind. They sold to F. F. Johnson, a nonresident of their county. He was a stranger to the Rome community and to his associates in the bank. He assumed temporary control of the bank, and departed within a short time, having first installed his brother, P. M. Johnson, as cashier. The record is silent as to the circumstances attending the sale, and as to the terms thereof. No direct testimony was offered for these officers as to whether any valuable consideration was actually paid for this stock, or whether the transfer was colorable, and a mere method of desertion of a sinking ship by a captain, in disregard of his passengers and crew. The circumstances appearing in evidence strongly challenged the consistency of this transaction with an honest and innocent belief in the solvency of the bank. The failure of explanation at this point fairly invites unfavorable inferences therefrom.

That they were conscious of the insolvency of the Rome bank on December 6th and on February 24th, fairly appears from the circumstantial evidence. No less does it appear that they were also conscious of the ignorance of these defendants of such condition. If the purpose of the execution of the note by these defendants was to underwrite the indebtedness of the Rome Savings Bank, it would have been quite the natural course to have Johnson, as owner of the majority stock, and his brother, the cashier, join in the execution thereof. No such request appears to have been addressed to the Johnsons, nor did they sign anything, except officially. On the contrary, Cashier Johnson called a meeting of the directors, and advised Whiting and Gillis

thereof, and invited their presence for the purpose of "coaxing" the directors. They came in response to this letter. Upon the whole record, we are confronted with the alternative either of finding that Whiting and Gillis obtained this note by fraudulent representations and fraudulent concealment of the insolvent condition of the Rome bank, or else that they obtained it for the temporary accommodation of plaintiff-bank, and with the purpose on their part to fully protect them against ultimate liability. We solve the question in favor of the latter alternative.

The decree of the district court is, accordingly, affirmed.— *Affirmed.*

FAVILLE, C. J., and ALBERT and MORLING, JJ., concur.